Please step up and identify yourselves. Good morning, Your Honors. My name is Brett Zeeb from the State Appellate Defender's Office, and I represent Janet Yurus, the defendant in this matter. Good morning, Your Honors. I'm Pete Fisher, an Assistant State's Attorney on behalf of the people. All right, you guys basically know the drill here. It's 15, and if we ask a lot of questions, then we give you more leeway. So when you're ready, roll. May I please the court? I'd like to reserve a couple minutes for rebuttal, if I may. Your Honors, more than 30 years ago, the Illinois Supreme Court in People v. Baines basically put up a large danger sign in bright lights regarding polygraph evidence. Was it intended for defense lawyers as well? I think it was, but more so for the prosecution, I would argue. But isn't the problem here that it didn't initially come from the prosecution? The prosecution was basically given a choice of ignoring an answer given by the defendant herself or asking questions about something that was raised for the first time by the defendant on direct examination. Well, Your Honor, that's certainly the argument that the state makes and a good question, but I think that's just one factor that this court has to look at to determine whether Ms. Yurus got a fair trial and whether the integrity of the judicial process was tarnished. If you go to People v. Baines and People v. Guard, the two main cases that the Illinois Supreme Court has decided, aside from Jefferson, in both of those cases, the court reviewed those cases as plain air. And in both of those cases, the defendant was partly responsible for bringing out this polygraph evidence into the case. In Baines, there was a stipulation by the parties that the results of the lie detector exam would come in. Now, here, as opposed to some of the cases, most of the cases, when someone speaks about polygraph, there was no, quote, polygraph evidence of the results of any polygraph exam because no polygraph exam went forward. It was simply the mention of polygraph and why, volunteered by the defendant, she did not take it. Well, Your Honor, I mean, I think the mere mention of polygraph with nothing more, I think I'd agree that that doesn't entitle a defendant to a new trial. But it went well beyond that here. And just taking a step back and looking at what Ms. Yurus testified to, defense counsel asked her a question. There's no indication in the record that defense counsel knew that Ms. Yurus was going to offer this information. She said, and they offered me a lie detector exam, and I said, I will take one if I have my lawyer. And then she added, I've got nothing to hide. Yeah, but doesn't that open the door, as the judge has indicated? It opens the door for them to rebut that evidence, but it doesn't give them carte blanche to introduce inadmissible evidence that's prejudicial to Yurus and evidence that the Illinois Supreme Court has repeatedly and emphatically said that it could not give. And that is when the state specifically equated her refusal to take the lie detector exam with her guilt. Now, again, getting back to what she testified to, I'd argue that, at best, her statement is ambiguous. She says, I didn't take the lie detector exam because I didn't have my lawyer. I had nothing to hide. Now, at that point, ideally, the state objects and says, Your Honor, let's have a conference with the lawyers. This evidence is improper. Let's strike it. Mr. Zeeb, what they are responding to is not just the mere mention of a polygraph exam that was declined according to the defendant. They're also responding to the second part of that, wherein she says, I would have been happy, pleased, excited to give a polygraph exam under certain circumstances because I have nothing to hide. Now, do they have to sit silently when the defendant has said, I have nothing to hide and would have taken a polygraph exam? Or are they entitled to respond and challenge her proffered motivation for declining the polygraph exam? Your Honor, absolutely, they're entitled to rebut that evidence. But in this case, they could have done that with proper admissible evidence. And, again, I'm going to get back to what does the jury take away if all they had heard was, I refuse to take the lie detector exam. I don't have anything to hide. I would have taken it, and even with your enthusiasm, I would have took it. But I wanted my lawyer, therefore I didn't take it. With nothing more, what does the jury take away from that? Well, she must not have taken a lie detector exam because she's on trial here, and the state presumably wouldn't bring a murder case against someone who passed a lie detector exam. So then the next logical step is, well, if she didn't take the lie detector exam, or maybe she did take it and she failed it, or maybe she does have something to hide. So I think at best it's ambiguous how that evidence even benefits Ms. Uroos. How about the other interpretation, which is at least as likely, is that her suggestion, if it was left alone, that because the police were mistreating her by not allowing her to have an attorney, that that is the only reason that stopped her from taking a lie detector test, which she says, in essence, through her statement that she had nothing to hide, that she would have otherwise passed. Well, then the state has no, the state can still. If they didn't create this choice in interpretations, I reiterate. Right. Your Honor, I think the response is then the state can then recall the sergeant and the detectives who interrogated her to then bring out some more specifics about the interrogation. Did she ask for a lawyer? If so, when did she do it? What did you do? Did she ask for a lawyer and then did you refuse to give her the lawyer? Presumably the sergeants can answer, no. She voluntarily spoke to us. When she asked for her lawyer, we gave her the lawyer. That eliminates the doubt. That statement about this polygraph exam and really the suggestion that the police were treating her unfairly. And once that is raised by the defendant, it seems to be your theory that the only thing that the state could do is ignore that, let it continue to hang out there and hope that the jury doesn't conclude that they, that the police officers were abusive. Well, it's a couple steps that you're going through, Your Honor. The first one is that they should have objected. They didn't. They didn't object. And then the next step is they have a – So they should have objected to what your client's lawyer said? No, what she testified to. Once you uttered those words regarding her refusal, she didn't take the polygraph, but she would have had she had a lawyer.  There should have been a meeting with the judge, ideally. And then that testimony should have been stricken. The jury should have been instructed that polygraph evidence is unreliable. But that's not what happened. This isn't a perfect world, so you've got to live with what you've got, and it doesn't look good. You've got no argument with me there except I disagree that it doesn't look good. Well, but why then didn't the defense attorney – why wasn't it the responsibility of the defense attorney at that point to call for the sidebar and make the same suggestion? Why is it the responsibility of the party that didn't bring that out to do so? And then why didn't the defense attorney ask for an instruction at some point either in the midst of the trial or in the concluding instructions to that effect? I mean, you keep placing the responsibility, and I understand, you know, your job. Believe me, I did that type of a job for most of my career. But you place the responsibility on the party that had no part whatsoever in bringing this issue before the jury. They didn't ask the question that evidenced – that brought that fact into evidence, nor did they prepare the witness because they couldn't speak to the witness in preparation for the trial and go through a dry run to say, okay, what would you say to this question? I mean, they were completely caught by surprise and could not have not been caught by surprise because they have no way of knowing what the witness is going to say, the defense is going to say. Well, Your Honor, I'm not arguing that they were not caught by surprise. But then – and I'm not also putting all the responsibility on the prosecutor. The judge also has some responsibility, and I agree that the defense counsel – although, again, there's no evidence that he knew that his client was going to say this. But he should have, shouldn't he? Well, ideally, but, you know, that's – as Justice Fitzgerald Smith said, this isn't a perfect world. But then, again, let's look at what the jury took away from this statement. You keep coming back to that, well, we don't know, and it's this unknown that was unfair to the state. And I agree that the state couldn't have anticipated that. But then once they did, you can – this could have been rebutted with admissible evidence. Like I said, they could have called back these two detectives and got more specifics regarding the interrogation. They could have got more specifics about whether she asked for a lawyer, when, and then what they did in response. Once the jury had that information, that eliminates any credibility that yours had where she would have taken this lie detector exam if only she had her lawyer. Presumably, at some point, she got a lawyer because she was represented at trial. She didn't represent herself. And then, again, regarding just, you know, if she opened the door to this or somehow invited this error, invited error only applies when there's no admissible evidence that can be brought out by the state to rebut it. Here, the state didn't do that. It seized upon this evidence of a refusal to take the lie detector test. And then it did specifically what the Illinois Supreme Court said it could not do. Well, they didn't call witnesses to talk about the lie detector test that was brought up by your client. But that doesn't matter. You say it seized upon it. The prosecutor asked rhetorically in cross-examination, and I'm sorry to interrupt, Your Honor. Go ahead. If yours was not guilty, then, quote, you don't have to worry about taking the old lie detector test, do you? The defense counsel objected at that point, and the trial court judge overruled the objection, and then there was no explanation. And then, so that's one. And then two, and then it should be noted that the defense counsel didn't ask any follow-up questions regarding this refusal to take a lie detector test, nothing more. In closing argument, the defense counsel did not argue. And she said she would take that lie detector test, and she was happy to do it. The defense counsel didn't go there. He stayed away from it. And then the prosecution gets up and says, you know what, ladies and gentlemen, Janet Uris told you on that witness stand she didn't want to take a lie detector test. She wanted the lawyer. What does an innocent person want to do, and what does a guilty person want to do? Specifically what the Illinois Supreme Court said that you cannot do. For me, the issue is less about the lie detector and wanting the lawyer, that she has a right to a lawyer. She said she wanted a lawyer. And for the prosecution to make a point out of her wanting a lawyer, that's where the rub is for me, not the lie detector part of it. I agree that they're, I mean, these errors go hand in hand, and I think they complement each other. But I think why this polygraph evidence is so important and why the Illinois Supreme Court said that it is, is because the fear is that the jury seizes upon this type of evidence. Instead of evaluating the admissible evidence in the case, instead of deciding the truth or deceptiveness of the actual witnesses, they instead seize upon this failure to take a lie detector test. Isn't the larger problem with the lie detector tests the fact that if they did occur, that the jury would then advocate its responsibility to determine truth or falsity in reliance on a mechanical test? And isn't that concern largely eliminated when there are no results of the test brought into evidence? I don't think so, Your Honor. I think what the Illinois Supreme Court has said, that there's no, you know, arguing that a person's failure to take a lie detector exam and then specifically equating... Did you ever argue the musical accompaniment? Now, what would you have done if that would have been my phone? That's what I want to know. He probably would have. I wouldn't have said a damn word. I have to leave this on because of my daughter. But unfortunately, it wasn't her. No worries, Your Honor. It's probably somebody that wants to go golfing right now because this is the last day of the year where it's going to be decent. Well, okay, Your Honor. Counselor. Yes. I'm sorry, Judge Epstein. Have you had an answer to your question? I'll answer your... Actually, could you repeat? No, I quit. I'll set this to go off again. Well, again, I think the danger that the Illinois Supreme Court is talking about, regardless of whether it's specific evidence that the person failed the exam or whether they did not take the exam because there was a fear they would fail it, that what the Illinois Supreme Court has said is the danger is equating that refusal to take the exam with the person's guilt. And in a case like this where there's, admittedly, there's a lot of evidence that the state put on, there are multiple witnesses, but they all told the police one thing. They all testified at trial to a completely different thing. So it comes down to who does the jury believe is credible? Is it Ms. Uroos who testified that she was not involved in this plan, that she loved her uncle and everything else? Or do they believe the law enforcement witnesses who said that, well, the witnesses are lying on the stand. They were telling the truth when they gave us these statements while they were in custody. So then it comes down to a credibility contest. And it's precisely this type of case that the Illinois Supreme Court has warned that it would be very easy for the jury to, instead of evaluating all this admittedly confusing evidence regarding multiple witnesses, multiple prior inconsistent statements that came in, confessions of a co-defendant that came in, and then all of this polygraph evidence, it would be, there's a very real danger that they seize upon these two improper things instead of evaluating the evidence. And if you look at Baines and Gard, that's still good law. Jefferson didn't overrule that. No subsequent Illinois Supreme Court decision has come out and said that Baines and Gard went too far. Again, Gard, the defense counsel, brought out the most damning evidence regarding polygraph evidence. And the court said, well, the defendant didn't object, didn't include it in a post-trial motion. We're going to review this as plain error. Even though the evidence was overwhelming there, even though the defendant brought out the most damning polygraph evidence, we're still going to order a new trial because of the integrity of the judicial process. Our case is much stronger than Gard. Here we have a sua sponte testimony from the defendant. And then you have the prosecutor not once but twice specifically equating her refusal to take this exam with her guilt. You have the defense counsel objecting and you have the judge overruling the objections. At that point, it's like a green light to the jury to consider this very evidence substantively. And then moving on to issue two. I mean, not only did the jury hear this evidence about her refusal to take a polygraph exam, they also heard twice that her co-defendant's son confessed to this offense. And in an accountability case like this where the state's theory is that the defendant was involved in this plan with her co-defendant and a few other co-defendants to rob and murder her uncle, when the jury hears twice that her co-defendant's son admitted his role in this offense, they're going to equate that same guilt to Ms. Uroof's. And despite the fact that that evidence was stricken, you might be able to understand. Wasn't the theory of the case that, I mean, that whatever the son might have done had nothing to do with the mother? No. The theory of the case was that Ms. — that the defendant, along with her son, and — I mean, from a defense point of view. She didn't know whatever else happened out there. She wasn't involved in it. Exactly, Your Honor. That's the defense theory was — And so even — and I, you know, not arguing whether it should have been presented or it should not have been presented, but even had it been presented that the son confessed without saying any implicated the mother, how does that vitiate, undermine in any way, the theory that was actually presented by the defense? Well, if this wasn't an accountability case, I agree with you, Your Honor, then. But this is an accountability case. But you — just because you're a mother doesn't mean you are accountable for the actions of your adult child. Your adult child co-defendant in the murder case, where the state's theory is she was involved in this plan before and during the offense. And isn't it actually the theory of the defense that whatever the son did or did not do, the mother was not involved in it in any way? Well, her theory was she was not involved in the plan, whoever was involved in the plan. But still, again, this comes back to how is this harmful? I mean, it's the state's burden to prove that this error was harmless beyond a reasonable doubt. This is a preserved error. And, again, this comes back to a credibility issue. Again, you have the defendant testifying that she was not involved in this plan, and then you have the state's law enforcement witnesses testifying that all these witnesses who testified at trial, they're lying right now, and we want you to believe their prior statements that they gave to us. So, again, in that circumstance, as a juror, is it easier to evaluate this volume of evidence and decide who's lying when or to seize upon, well, her son confessed. The state is saying that her son was involved in this plan with her to murder their uncle. And she refused to take a lie detector test. The harm is very tangible and real, and the possibility is very real that that's what the jury did. And the Illinois Supreme Court in these prior cases, Baines and Guard, ordered new trials with a lot less, with a lot less, and without hearing the confessions of a co-defendant. I mean, this case is so much more stronger than Baines and Guard, I don't know what else to say. Sounds like you're finished. Well, I will say, does anyone have any more questions? I'd be happy to answer them. I would just like to hear about the duplicative inconsistent statements. Well, Your Honor, our argument there is that the state can rebut evidence with a prior inconsistent statement, but they can't do it with three or four. They should be able to do it with one. Of course, that's contrary to the reported decisions at this point. I acknowledge that we've not been successful with this argument, but that doesn't mean that it's not a good argument. I wrote one. You're going to try. Well, again, Your Honor, look at that evidence in the context of this case, where the jury has heard this polygraph evidence, they've heard the confessions of a co-defendant, and then the state is piling on prior inconsistent statement after prior inconsistent statement, trying to convince the jury that the witnesses are lying on the stand now, in trial, and they were telling the truth in custody. You would have had more fun trying this case than doing the appeal, I think. I'm having fun right now. Again, I can't stress that this case is much stronger than Baines and Guard, and those cases are still good law. So I think that if you're going to issue a decision that says that the defense opened the door and invited this error, I think that's only one factor this Court has to look at. You have to look at, also, what did the state do with the evidence? And here, it speaks for itself. They equated her guilt with her refusal to take the exam, not once, but twice. And then what did the Court do with it? Did it try to cure the error? No. It overruled the objections. It gave no jury instructions to the jury about the unreliability of polygraph evidence, that it should be stricken. And perhaps defense counsel should have asked for those instructions as well. But it's also the judge's job to make sure that the jury is properly instructed. Thank you. New trial. Thank you. Good morning, Your Honors, and may it please the Court. With regard to the polygraph evidence, as has been pointed out, this came out as part of defendant's own direct testimony. Mr. Fisher is a career appellate prosecutor. I just wonder, do you ever want to call up the people who try the case for the State's Attorney's Office and create these issues on appeal and ask, why don't you come up and defend that? Because maybe in this case, you would ask them to defend. You don't have to worry about taking that old lie detector test, do you? What's their theory as to why that's a good question to ask? Or maybe she wanted a lawyer. What does an innocent person want to do, and what does a guilty person want to do? Would you agree with me that life would be better regardless of whether or not this was brought out by the defense attorney if the state's attorney had a little self-control and didn't say those things? Well, I'll agree in a portion of that, but let me back up. I was one of those trial assistants, too. I've tried several hundred of those murder cases myself. I've done things. I've been in the heat of battle, and I know the kinds of things that go on. And I have talked to the prosecutors in this particular case, as I do in all my cases, and hopefully because I've been around a while, they listen. And frankly, when I picked this case up and I looked at what the prosecutor had said, I said, geez, you can't say that. Then I actually read the record. And to put into context, and did he go a little bit further than he may have gone? Possibly. But the point is here, these cases all have, the cases defense sites, there's a purpose behind them, and that's so that you don't hold something, the defendant's constitutional rights against him. And in this particular case, this defendant is claiming that she asked for a lawyer and that she refused the polygraph, and it was all part of her defense was to show how terrible the police were and that she never made any statements at all. And of course, the underpinnings of Doyle, and that's really what this is all about, the underpinnings of Doyle are you take the defendant's silence and you argue that innocent people don't remain silent in the real world, and it's a way of hiding behind your rights, and so you imply that she's guilty because she remains silent. Well, our theory in this case was that she didn't remain silent. Our theory was that we want you to consider her guilty because she made these statements. And when she gets up there and says, I have nothing to hide. If you substitute lie detector tests for remaining silent in Doyle, isn't that exactly what the attorney is suggesting? When he says you don't have to worry about taking the old lie detector test, do you? Isn't that the same as you don't have to worry about talking to us if you're innocent? Sure, but what he was doing there is saying that her statement that she asked for a lawyer and that she refused the lie detector test was a lie in itself. In Doyle, you're taking the silence and you're saying let's presume guilt from the silence. In this case, we're saying don't believe her claim that she was silent because she wasn't silent. She made a statement and we want you to believe the statement. We don't want you to believe what she said on the stand. We don't think that's true. We want you to believe what she said in the statement. We're not asking you to infer guilt from silence. We're asking you to infer guilt from the statement that we've properly introduced. And the interesting thing is when she is on the stand and testifying, her whole purpose is to say the police are terrible. The police did all these terrible things to me. But this is a woman who claims she never made a statement. She says she didn't even spoke to Wojcik at all. So what's the point of all this to just say the police are terrible? Because if the police do all these terrible things and you don't make a statement, who cares? What difference does it make? The police didn't induce her statement. She's not claiming the police coerced me into making this statement. She's saying I didn't make a statement at all. I had nothing to hide and she's making denials throughout. So it's the opposite of a Doyle violation. And the notion that we had to object somehow when she brought up this polygraph evidence, which, again, it's not really polygraph evidence. It's a claim that I refused to take a lie detector test, something that was never mentioned before. I remember this woman had a motion to suppress that she lost. She had a motion to quash that she lost. She had lots of opportunities to legally bring these things up if there was something to it. And all of a sudden she just blurts this out. And I don't think the defense attorney knew she was going to say this, but I don't think it's incumbent on the state's attorney to object because what she said is I refused to take a polygraph test. Well, I don't know whether she did or didn't. I don't know whether she was ever offered a polygraph test. I don't think it matters because the results don't come in or the lack of results don't come in. And I think we would be in more trouble had we stood up there and started talking about it. Let's say she was offered a polygraph. And we're supposed to now bring out evidence about asking her about the polygraph? I think what Mr. Zee is suggesting is we have to ignore the whole question or the whole response. I don't know. She's using her rights as a sword here. It's not a shield that's being employed here. And when she starts swinging the sword, I think we're entitled to defend ourselves against that. And this whole process I said was one big the police are horrible, don't believe anything the police are doing. And it's part and parcel. And I think we're entitled to respond to that, to say, no, you never said any of these things. The purpose of the state's attorney saying, I mean, when she finishes, I've got nothing to hide. She's using it as a sword. And I think we're entitled to respond to say, well, if you've got nothing to hide, then why don't you say something? Because the whole point was to say that her claims of innocence, her protestations of having asked for a lawyer and having refused the polygraph were a lie. Don't believe them. They are inconsistent with her claims of innocence. But that's not what the state's attorney said. Oh, I think it is. I think it is. Why do you ask for a lawyer if you're innocent? Why? Because, and we argued in closing argument, he says don't believe her that she asked for a lawyer. Don't believe her that she refused the polygraph. That's nonsense. It's complete nonsense. She says she never spoke to Wojcik at all. Well, our case is based on the fact that she confessed to Wojcik. We don't want this so-called silence to be construed against her. We want the jury to believe that she confessed to Wojcik. So it's the opposite of a Doyle violation. And the mere fact that the word, and there's no talismanic significance to the word that lie detectors spit out. She said it. She wanted to benefit from it. She shouldn't be allowed to benefit from it. In terms of the closing argument, that's not in their post-trial motion. And it is waived. There were 55 other things that were in their post-trial motion. This wasn't one of them. It was a very detailed post-trial motion. It's not plain error on the basis of a mere statement during closing argument. And so, therefore, that issue should not grant relief. Now, the second issue that has been raised today is the, in their brief, it's called a Crawford violation. Or the implication that there's a Bruton violation. Now, what we have here is a detective, or a sergeant, who's on the stand. And at two different points, one during the conversation with Lindsay Kupfer-Schmidt, and one during the conversation with the defendant, says something like, the son or your brother, and then in the instance your son, admitted his role in this. Or he confessed. Now, the objection is sustained. The judge says stricken. So it should be cured. But given what was actually happening, in both those instances, other than the fact of the statement that your son or your brother admitted his part in this, we don't know what he admitted. There's certainly no statement that he admitted his part and said, you did it also, that Janet, you're involved in this, so the Bruton situation isn't present. Crawford applies to, by its very nature, it says it doesn't apply to things that are not offered for the truth of the matter. This statement, and I don't even think the judge necessarily should have sustained the objection, but he did, this statement was offered to show the effect on the listener. Do you want more business? What? Do you want more business in the future? Well, it's certainly a close case as to whether or not he should have sustained it. In any event, if you look at what was said, it's not a Crawford violation. It's not a Bruton violation. So what is it then? And where is the harm? I mean, if it's offered to show the effect on the listener or to show why, remember, the context in these two cases, the sergeant was on the stand and he was explaining that Lindsay was denying, denying, denying. I always get to the situation in these circumstances where the Crawford true purpose for bringing in something that is so radioactive is, in effect, balanced against the destructive and improper use of that. And so one might say that it's something that's better left unsaid, regardless of whether it constitutes reversible error or not. Well, I would point out again, in the context of this case, that it's very clear that I believe the judge and even the defense attorney at trial admitted they didn't think the prosecutor was trying to pull a fast one. They think that the sergeant himself just blurted this out. There was a lot of blurting on both sides. Now, there was some blurting, but what I think he should have said was, we have a statement by, instead of a confession or something, he should have said, we have a statement by Richard, and the purpose was to show that Lindsay then changed her mind. And then she gave a statement. And the same thing for the defendant herself. The defendant herself then asked, well, I want to see these statements. And then they hand her some papers and she looks at them and then she starts to cry and she makes a statement. So this is, it's properly admissible, something is at least properly admissible to show the effect on the listener and to show why she changed her story for both Lindsay and for the defendant. But in either case, of course, no information comes out about this confession. And even if the word confession, I don't think it was used, he admitted his part. His part, right, not her part. And therefore, those things, as I said, those were stricken and therefore any possible error was cured. This was not a close case. Yes, there were a lot of prior inconsistent statements, but the extent to which the people on the stand flipped was astounding. I mean, some of the things that these people were claiming to carry, I mean, she had, she was in the room for two days, she was on drugs, she was sick, she had diarrhea, she was vomiting, she defecated on herself, she couldn't use the bathroom, she had nothing to eat or drink, she had nowhere to lay down, she's a drug addict, she smoked crack, she'd been doing crack for two weeks, she was high, she was going through withdrawal, she hadn't smoked crack, they kept harassing her, they'd tell her she knew something, they gave her bits and pieces. Can you rap it? Yeah, yeah, I wish I could. So this was the kind of evidence that these flippers tried to pull on the jury, and we were entitled, and under the case law, to rebut that with their prior inconsistent statements. And, of course, we're entitled to do that, as you know, in more than one fashion, especially because what happens, as happened in this case, is, okay, I said that to the police, but that's because the police were doing all those horrible things to me. But then when you went to the grand jury, you said something, said, well, then there's a different excuse there, so you have a series of excuses, and then you have the one man, Ayala, who eventually says that everything was a lie to the police and to the state's attorneys, and then he goes to Bill Gamboni's office and he gives yet another statement, and there he takes everybody but, you know, he takes Pabon out of the case but keeps everybody else in. So these were certainly reliable statements. In short, Your Honors, we'd ask that for the reasons stated in the briefs and here today, that you affirm the defendant's conviction and sentence. Thank you. Thank you. Your Honors, I'll be brief, and I'll spare you a rap as well. If you think you can pull it off, go right ahead. I'm going to do the worm right here on the floor in a minute. Your Honors, regarding the first argument, we're not making a Doyle argument. We're not making the opposite of a Doyle argument. We're making a polygraph evidence argument that's based on clear Illinois Supreme Court precedent. Guard, Baines, People v. Jefferson, and to address the argument, Mr. Zeeb, that Mr. Fisher makes that really in the context of this case, they're not using the failure to take the polygraph exam, although, you know, they're really trying to challenge the statement that the defendant made, that she made no confession whatsoever. And they're saying, oh, yes, you did. And the reason we know you – one of the reasons we know you did, on top of the fact that we have people who are testifying as to the statement, is that your proffered reason for saying that you didn't make a statement is inconsistent with the way people behave. Well, I think the easiest answer to the question, Your Honor, is that the prosecutor himself argued that her refusal to take the lie detector exam was because she was guilty. I mean, we can't dance around that fact. He did it twice. He asked a rhetorical question on cross-examination. And then on closing argument, he specifically said, what does an innocent person do and what does a guilty person do? So how the jury is supposed to just ignore that, especially when the defense counsel's objections were overruled, is just beyond me. And second, if the state's – what the state was really trying to do was just explain that she really did make a statement, then – I mean, they did that. They put on Wojcik and they could put on whatever other detective or police officer was in that interrogation room and testify that she made the statement. And that's what they did. That rebuts the defendant's argument that I didn't make an inculpatory statement. Just – you can't use improper evidence that's specifically prohibited by the Illinois Supreme Court, this toxic evidence, as you put it, to then – I think I said radioactive. Radioactive. That's even better. Glad you approved. It doesn't give them free rein to bring in that type of evidence, even if the evidence might have some other purpose. And then lastly – I'm sorry. In addition, I'm not just saying that the state should have just stayed silent and done nothing. They could have brought out more evidence from Wojcik and any other officer who was in the room that, again, went to whether the defendant asked for a lawyer, when did she ask for the lawyer, what did you do when she asked for a lawyer, and that eliminates any credibility that Uros might have had that she would have taken this lie detector exam only if she had a lawyer because what would the jury be left with then? Well, she must not have made a – she must not have taken that polygraph exam because she's being tried for this murder. If she did take that polygraph exam, well, she must have failed it because they're prosecuting her. Either way, her credibility is lessened by that evidence. Finally, the state – what they seem to be doing is just expanding People v. Jefferson, the Illinois Supreme Court case. There was a very limited exception that the court allowed polygraph evidence to come in, and that was to rebut the defendant's claim that she made an inculpatory statement for the sole reason because the police told her that if she made the statement, she could go see her child who was hours away from dying. So that's what she testified to at trial. In that limited circumstance, the court said, well, it's okay for the state to bring out the fact that right before she gave the inculpatory statement, she was offered a polygraph exam. There's a leveling of the playing field there to explain this inculpatory statement. But here, of course, Ms. Ewers, her testimony was, I never made an inculpatory statement. So that's – Jefferson does not apply there, and that would just be unnecessarily expanding Jefferson. Real quickly on the second issue, you can't – and also, I'm sorry, Your Honors, waiver, the first part regarding the improper cross-examination of the rhetorical question, that is preserved. It was objected to. It was included in the motion for a new trial. The closing argument was objected to, but that specific argument was not included in the motion for a new trial. But, again, looking at Baines and Gard there, the court applied a plein air analysis to order a new trial. Regarding the second argument, again, we're not raising a brutal argument, and this was a Crawford violation. Hearing that your co-defendant in an accountability case confessed to his role in the murder, the jury is going to take that information. They've been instructed on accountability, what that means, and it's not a huge logical leap to make the connection there that also implied that Janet was guilty for this offense. And the co-defendant's confession coming in that implicates the defendant is testimonial. That is a Crawford violation. Why does it implicate the defendant in this case? Because it's an accountability case. That's the theory, but why is that theory supported by the fact that the guy admitted his own, the son admitted his own? Because the State's whole theory through opening argument, through its closing argument was that Janet was involved in this plan with her son. I know that's their theory, but why does the admission of one person, despite their theory, why does that create an implication that the allegedly cooperating or accountable party was also involved? Well, I don't see how the jury looking at that evidence could conclude otherwise. But it's not direct testimony. I'm sorry? To be a Crawford violation, it has to be direct. Indirect doesn't count. It has to say you. This did not say you. This said him. Inference, maybe, but that's not a Crawford violation. Well, I would argue otherwise. I mean, there's three cases on it that explicitly state that. I just don't remember them at this point. Well, just picture yourself as a juror in that juror room. You hear that the defendant's co-defendant's son, who you've heard all this evidence was involved in this plan to murder Henry Roble, the defendant's uncle, has admitted his role in this. Well, I'm sure. Unless the jury has to conclude that. Unless the jury has to conclude the evidence that he thought they were all guilty in sin. Well, again, this goes back to usurping the function of the jury. Do we want our juries to make their decisions based on proper evidence, or do we want them to base their decisions based on an untaken polygraph exam or hearing that the co-defendant's son did it? I mean, the jury heard it. Well, you disarm this prosecution totally. In other words, they have nothing to offer if we went along with you on two of your three. That's why I originally said you should have tried this case. You would have had much more fun. All we're asking for in a new trial is that polygraph evidence does not come in, both from the defendant and from the State, and that hearing confessions of a co-defendant not come in. That's what we're arguing. And, again, Baines and Gard are both cases with far worse facts than this one, where it was plain air, where the defense brought out this evidence, even the most damning evidence, and they still granted a new trial. These cases have not been overruled. All right. Thank you. Thank you. We enjoyed both arguments. You were both well-prepared and interesting and made the best you could with the cases you had. Thank you both.